359 A.2d 422

Myrtle UNDERWOOD, Administratrix of the Estate of Lee E. Underwood, Deceased, Appellant,

v.

The PRUDENTIAL INSURANCE COMPANY OF AMERICA.

Superior Court of Pennsylvania.

June 28, 1976.

Samuel J. Goldstein, Pittsburgh, for appellant.

John H. Scott, Jr., Reed, Smith, Shaw & McClay, Pittsburgh, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT, and SPAETH, JJ.

PRICE, Judge.

This suit was brought by Lee E. Underwood to recover proceeds of a life insurance policy on the life of Frank L. Underwood. Lee E. Underwood died during the course of the proceedings and Myrtle Underwood, the administratrix of Lee E. Underwood's estate, was substituted as plaintiff. In the lower court, both parties moved for summary judgment and both motions were denied. The case proceeded to trial, non-jury, and resulted in a verdict in favor of the defendant-appellee. We affirm.

On November 20, 1967, Frank L. Underwood, at that time aged 59, executed the first part of a two-part application for life insurance from the appellee. The application was for a $10,000.00 ten year decreasing term policy with monthly premium of $14.30. The second part of the application was not executed until December 9, 1967. From November 22, 1967 to December 7, 1967, Mr. Underwood had been a patient at South Side Hospital, Pittsburgh, Pennsylvania, under the supervision of Dr. Loren Rosenbach. After a series of diagnostic tests,

Dr. Rosenbach diagnosed Mr. Underwood's condition as arteriosclerotic heart disease with congenital heart failure, pulmonary edema, and pleural effusions. After discharge from the hospital, Mr. Underwood was required to take medicines used in the treatment of heart disease and to follow a low sodium diet.

After receiving the second part of Mr. Underwood's application, appellee refused to issue the policy at the $14.30 premium but offered to issue the policy at a monthly premium of $25.40. Mr. Underwood agreed to pay the higher premium and the policy was issued on December 14, 1967. On January 6, 1969, Mr. Underwood filed an application to exercise the conversion privilege contained in the policy. On January 14, 1969, appellee issued a limited payment life insurance policy, in the face amount of $3,500.00, with monthly premium of $26.88. On December 9, 1969, Mr. Underwood died.

Appellee has failed to pay the proceeds of the policy to the beneficiary, arguing that its obligation was eliminated by false statements made by the insured in the second part of the application. The second part of the application was required to be completed by a medical doctor, and consisted of detailed inquiries into the applicant's medical history. Some of the questions asked and answered in the negative are as follows:

"5. Have you ever been treated by any physician or other practitioner for or had any known indication of:

a. heart trouble or murmur, chest pain, high blood pressure, or abnormal pulse?

. . . . . . . .

"6. Have you even been treated by any physician or other practitioner for or had any known indication of any disease or disorder of any of the following not disclosed in the answers to Question 5:

a. heart, blood, or blood vessel?"

Questions 7a. and b. were answered in the affirmative:

"7. Have you ever:

a. been in any hospital, sanitarium, or other institution for observation, rest, diagnosis, treatment, or any operation?

b. had any surgical operations?"

Also answered affirmatively were questions 8. b. and 9.:

.   .   .   .   .   .   .   .

"8. Have you, within the past 5 years, ever:

b. had any X-rays or electrocardiograms, or other medical tests?

.   .   .   .   .   .   .   .

"9. Other than as disclosed in the answers to Questions 5 through 8, have you, within the past 5 years, ever consulted or been attended by or been examined or had a check-up by any physician or other practitioner?"

Question 14 demanded the "full particulars with respect to each and every part of Questions 4 through 13 to which the answer is 'Yes.' "

In the space allotted for the answer to Question 14, Mr. Underwood indicated that he had been hospitalized for a bilateral inguinal herniography in 1936 and that he had had a checkup at the United States Public Health Service in 1962. The 1967 hospitalization and treatment were not mentioned. The application was signed by Dr. J. L. Kaufman and by Mr. Underwood.

■ In order to avoid its obligations under these circumstances, the insurer's burden of proof is clear: The insurer must show that (1) the statements were false; (2) the statements were material; and (3) the applicant must have known that the statements were false and made them in bad faith. *Lynch v. Metropolitan Insurance Co.*, 427 Pa. 418, 235 A.2d 406 (1967); *Shafer v. John Hancock Mutual Life Insurance Co.*, 410 Pa. 394,

189 A.2d 234 (1963); *Kizirian v. United Benefit Life Insurance Co.,* 383 Pa. 515, 119 A.2d 47 (1956).

In this case, there is no dispute that statements contained in the application were false. Appellant contends that there is no evidence that Mr. Underwood knew that the statements were false or that he made them in bad faith. However, plaintiff admitted in her pleading under New Matter that the application had been executed by Mr. Underwood. The hospitalization and examination of Mr. Underwood terminated only two days prior to his execution of the application. Therefore, there can be no allegation that Mr. Underwood innocently forgot about the treatment. There is no evidence that Mr. Underwood was deceived into falsely answering the questions. Dr. Rosenbach testified that although he could not particularly remember telling Mr. Underwood of his diagnosis, it was his normal procedure to do so. Under these circumstances the fact-finder's conclusion that Mr. Underwood knew that the statements were false is supported by the record. *See Kizirian v. United Benefit Life Insurance Co., supra; Derr v. Mutual Life Insurance Co.,* 351 Pa. 554, 41 A.2d 542 (1945). Furthermore, an answer known to be false when made is presumptively fraudulent. *Baldwin v. Prudential Insurance Company of America,* 215 Pa.Super. 434, 258 A.2d 660 (1969).

Appellant contends that Mr. Underwood cannot be held to have known what statements were contained in the application, relying on *Rempel v. Nationwide Life Insurance Co.,* 227 Pa.Super. 87, 323 A.2d 193 (1974). In that case, the beneficiary sued the insurer, basing her claim on misrepresentations made by the insurer's agent concerning the policy's coverage. The insurer defended on the grounds that, because the insured had had a copy of the policy, and could have read it, he had no right to rely on misrepresentations by the agent. This court held

that "we will not now hold that the insured must read the policy or be barred from any relief for negligent misrepresentations made by an agent of the insurer . . . ." 227 Pa.Super. at 94, 323 A.2d at 197.

*Rempel* is clearly distinguishable from this case. There is nothing in the record to indicate that the questions on the application were misrepresented to Mr. Underwood. The only evidence of misrepresentations were those made *by* Mr. Underwood. Secondly, this case does not involve the clarity of the policy itself, which was a concern in *Rempel*. This case involves an application form which was short, clear, and uncomplicated.

■ There would seem to be little room to doubt that knowledge of the existence of heart disease in a 59 year old man is a material consideration in an application for life insurance. As stated in *Prevete v. Metropolitan Life Insurance Co.*, 343 Pa. 365, 368, 22 A.2d 691, 692 (1941), "[i]nquiries as to prior medical attendance are material to the risk and false answers thereto must of necessity permit the insurer to avoid the policy . . . . (citation omitted)."

Appellant contends that the immateriality of the statements is demonstrated by several facts. First, appellant notes that the appellee rejected the opportunity to issue a policy at the standard premium of $14.30 and required, instead, an increased premium of $25.40. Appellant argues that the only possible reason for such an action is that the company was already aware of Mr. Underwood's heart condition, thereby rendering the false statements immaterial. However, there is no other evidence that the appellee knew of Mr. Underwood's heart condition, and the record supports the conclusion that the increased premium resulted from appellee's knowledge that Mr. Underwood was a heavy consumer of alcohol.

■ Second, appellant contends that the appellee was put on notice of Mr. Underwood's heart condition, and

that it was thereby placed under a duty to inquire. Specifically, appellant notes that records of Mr. Underwood's heart condition were on file with the United States Public Health Service and that if appellee had checked those records, it would have been aware of the misstatements made by Mr. Underwood. However, the only information supplied to appellee which would have led to the United States Public Health Service records was Mr. Underwood's admission in the second part of the application that he had received a checkup from the United States Public Health Service in 1962. Appellee's expert underwriter testified that such minor leads are not followed. We will not hold as a matter of law that appellee was under a duty to investigate a checkup that had occurred five years earlier.

Finally, appellant contends that the initial $10,-000.00 decreasing term policy and the subsequent $3,-500.00 limited life policy were too separate and distinct policies, and that the false statements in the application for the first policy could not be applied to avoid the obligation in the second policy. However, the conversion privilege in the first policy provided that no additional evidence of insurability needed to be supplied in order to exercise the privilege. Thus, in contracting for the conversion privilege, the appellee was clearly relying on the accuracy of the information supplied in the application for the first policy.

In *Pannabaker v. General American Life Insurance Co.*, 329 Pa. 524, 198 A. 626 (1938), the Supreme Court of Pennsylvania held that an insurance company could not deny a policy-holder the right to exercise a contractual conversion privilege, even where the insured's health had deteriorated since the issuance of the initial policy. Thus, the nature of the convertibility provision requires that fraudulent misstatements employed in procuring the first policy be imputed to the pro-

curement of the second. A contrary conclusion would deprive the insurer of the ability to protect itself against fraud.

The order of the lower court is affirmed.